## UNITED STATES DISTRICT COURT
## DISTRICT OF OREGON

| | |
|---|---|
| JOHN BYRNE, Individually and on behalf of all others similarly situated,<br><br>    Plaintiff,<br><br>    v.<br><br>WESTPAC BANKING CORPORATION, BRIAN CHARLES HARTZER, and PETER FRANCIS KING,<br><br>    Defendants. | Case No:<br><br>CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS<br><br>JURY TRIAL DEMANDED |

Plaintiff John Byrne ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants (defined below), alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through his attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, public filings, wire and press releases published by and regarding Westpac Banking Corporation ("Westpac" or the "Company"), and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

### NATURE OF THE ACTION

1.      This is a class action on behalf of persons or entities who purchased or otherwise acquired publicly traded Westpac securities between November 11, 2015 and November 19, 2019, inclusive (the "Class Period"). Plaintiff seeks to recover compensable damages caused by

1

Defendants' violations of the federal securities laws under the Securities Exchange Act of 1934 (the "Exchange Act").

## JURISDICTION AND VENUE

2.      The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

3.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, and Section 27 of the Exchange Act (15 U.S.C. §78aa).

4.      Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)) as the alleged misstatements entered and the subsequent damages took place in this judicial district.

5.      In connection with the acts, conduct and other wrongs alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

6.      Plaintiff, as set forth in the accompanying certification, incorporated by reference herein, purchased Westpac securities during the Class Period and was economically damaged thereby.

7.      Defendant Westpac purports to provide various banking and financial services in Australia, New Zealand, Asia, the Pacific region, and internationally. Westpac is incorporated in New South Wales, Australia and its principal executive offices are located at 275 Kent Street, Sydney, NSW 2000, Australia. Westpac's American Depositary Receipts ("ADRs") trade on the New York Stock Exchange ("NYSE") under the ticker symbol "WBK."

8.    Defendant Brian Charles Hartzer ("Hartzer") served as the Company's Chief Executive Officer ("CEO") and Managing Director from February 2, 2015 until November 25, 2019.

9.    Defendant Peter Francis King ("King") served as the Company's Chief Financial Officer ("CFO") throughout the Class Period.

10.    Defendants Hartzer and King are collectively referred to herein as the "Individual Defendants."

11.    Each of the Individual Defendants:

(a)    directly participated in the management of the Company;

(b)    was directly involved in the day-to-day operations of the Company at the highest levels;

(c)    was privy to confidential proprietary information concerning the Company and its business and operations;

(d)    was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

(e)    was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

(f)    was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

(g)    approved or ratified these statements in violation of the federal securities laws.

12.    Westpac is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

13.    The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to Westpac under *respondeat superior* and agency principles.

14.    Defendants Westpac and the Individual Defendants are collectively referred to herein as "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Materially False and Misleading
### Statements Issued During the Class Period

15.    On November 11, 2015, Westpac filed with the SEC its Annual Report on Form 20-F for the fiscal year ended September 30, 2015 (the "2015 20-F"). Attached to the 2015 20-F were certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Hartzer and King attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

16.    The 2015 20-F stated the following regarding anti-money laundering regulation and related requirements, including the Company's compliance with the Australian Transaction Reports and Analysis Centre's ("AUSTRAC") requirements:

> Australia
>
> Westpac has a Group-wide program to manage its obligations under the Anti-Money Laundering and Counter-Terrorism Financing Act 2006. We continue to actively engage with the regulator, AUSTRAC, on our activities.
>
> United States
>
> The USA PATRIOT Act of 2001 requires US financial institutions, including the US branches of foreign banks, to take certain steps to prevent, detect and report individuals and entities involved in international money laundering and the

financing of terrorism. The required actions include verifying the identity of financial institutions and other customers and counterparties, terminating correspondent accounts for foreign 'shell banks' and obtaining information about the owners of foreign bank clients and the identity of the foreign bank's agent for service of process in the US. The anti-money laundering compliance requirements of the USA PATRIOT Act include requirements to adopt and implement an effective anti-money laundering program, report suspicious transactions or activities, and implement due diligence procedures for correspondent and other customer accounts. Westpac's New York branch and its other US operations maintain an anti-money laundering compliance program designed to address US legal requirements.

US economic and trade sanctions, as administered by the Office of Foreign Assets Control (OFAC), prohibit or significantly restrict US financial institutions, including the US branches and operations of foreign banks, and other US persons from doing business with certain persons, entities and jurisdictions. Westpac's New York branch and its other US operations maintain compliance programs designed to comply with OFAC sanctions programs, and Westpac has a Group-wide program to ensure adequate compliance.

17.    On November 9, 2016, Westpac filed with the SEC its Annual Report on Form 20-F for the fiscal year ended September 30, 2016 (the "2016 20-F"). Attached to the 2016 20-F were SOX certifications signed by Defendants Hartzer and King attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

18.    The 2016 20-F stated the following regarding anti-money laundering regulation and related requirements:

Australia

Westpac has a Group-wide program to manage its obligations under the Anti-Money Laundering and Counter-Terrorism Financing Act 2006. We continue to actively engage with the regulator, AUSTRAC, on our activities.

United States

The USA PATRIOT Act of 2001 requires US financial institutions, including the US branches of foreign banks, to take certain steps to prevent, detect and report individuals and entities involved in international money laundering and the financing of terrorism. The required actions include verifying the identity of financial institutions and other customers and counterparties, terminating correspondent accounts for foreign 'shell banks' and obtaining information about

5

the owners of foreign bank clients and the identity of the foreign bank's agent for service of process in the US. The anti-money laundering compliance requirements of the USA PATRIOT Act include requirements to adopt and implement an effective anti-money laundering program, report suspicious transactions or activities, and implement due diligence procedures for correspondent and other customer accounts. Westpac's New York branch and its other US operations maintain an anti-money laundering compliance program designed to address US legal requirements.

US economic and trade sanctions, as administered by the Office of Foreign Assets Control (OFAC), prohibit or significantly restrict US financial institutions, including the US branches and operations of foreign banks, and other US persons from doing business with certain persons, entities and jurisdictions. Westpac's New York branch and its other US operations maintain compliance programs designed to comply with OFAC sanctions programs, and Westpac has a Group-wide program to ensure adequate compliance.

19.    On November 8, 2017, Westpac filed with the SEC its Annual Report on Form 20-F for the fiscal year ended September 30, 2017 (the "2017 20-F"). Attached to the 2017 20-F were SOX certifications signed by Defendants Hartzer and King attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

20.    The 2017 20-F stated the following regarding anti-money laundering regulation and related requirements:

> Westpac has a Group-wide program to manage its obligations under the Anti-Money Laundering and Counter-Terrorism Financing Act 2006 (Cth). We continue to actively engage with the regulator, AUSTRAC, on our activities.
>
> Our Anti-Money Laundering and Counter-Terrorism Financing Policy (AML/CTF Policy) sets out how the Westpac Group complies with its legislative obligations.
>
> The AML/CTF Policy applies to all business divisions and employees (permanent, temporary and third party providers) working in Australia, New Zealand and overseas.
>
> United States
>
> The USA PATRIOT Act of 2001 requires US financial institutions, including the US branches of foreign banks, to take certain steps to prevent, detect and report

individuals and entities involved in international money laundering and the financing of terrorism. The required actions include verifying the identity of financial institutions and other customers and counterparties, terminating correspondent accounts for foreign 'shell banks' and obtaining information about the owners of foreign bank clients and the identity of the foreign bank's agent for service of process in the US. The anti-money laundering compliance requirements of the USA PATRIOT Act include requirements to adopt and implement an effective anti-money laundering program, report suspicious transactions or activities, and implement due diligence procedures for correspondent and other customer accounts. Westpac's New York branch and Westpac Capital Markets LLC maintain an anti-money laundering compliance program designed to address US legal requirements.

US economic and trade sanctions, as administered by the Office of Foreign Assets Control (OFAC), prohibit or significantly restrict US financial institutions, including the US branches and operations of foreign banks, and other US persons from doing business with certain persons, entities and jurisdictions. Westpac's New York branch and Westpac Capital Markets LLC maintain compliance programs designed to comply with OFAC sanctions programs, and Westpac has a Group-wide program to ensure adequate compliance.

21.     On November 7, 2018, Westpac filed with the SEC its Annual Report on Form 20-F for the fiscal year ended September 30, 2018 (the "2018 20-F"). Attached to the 2018 20-F were SOX certifications signed by Defendants Hartzer and King attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

22.     The 2018 20-F stated the following regarding the Company's compliance with newly enacted anti-money laundering legislation:

Anti-Money laundering and counter-terrorism financing reforms and initiatives

On 13 December 2017, the Anti-Money Laundering and Counter-Terrorism Financing Amendment Act 2017 (Cth) (Amendment Act) became effective and introduced a number of reforms to the Anti-Money Laundering and Counter Terrorism Financing Act 2006 (Cth) (AML/CTF Act), including:

§       expanding the Australian Transaction Reports and Analysis Centre's (AUSTRAC) power to issue infringement notices and remedial directions;

§       refining the 'tipping-off' provisions so that reporting entities can share

7

information with certain related bodies corporate; and

§       regulating digital currency exchange providers.

Many of the changes introduced by the Amendment Act arise from a recent review of Australia's AML/CTF framework (Statutory Review), the findings of which were set out in the Report on the Statutory Review of the AML/CTF Act and Associated Rules and Regulations, which was tabled in Parliament on 29 April 2016. The Statutory Review took into account the relevant findings of the Financial Action Task Force's mutual evaluation of Australia's AML/CTF regime. The Government has published a 'Project Plan' for implementing the reforms recommended by the Statutory Review, and it is likely further reforms will be legislated in the near future.

In addition to the potential for ongoing legislative change, over the past few years AUSTRAC has increasingly emphasised its role in collecting, analysing and disseminating financial intelligence data to its law enforcement partners. One way AUSTRAC has sought to do this is through greater collaboration with the financial services industry. In 2016, AUSTRAC created the Fintel Alliance, an initiative which involves AUSTRAC, various financial services entities (including Westpac) and public sector bodies collaborating with the aim of developing and sharing actionable intelligence and insights that address key AML/CTF risks.

In this environment of ongoing legislative reform, regulatory change and increased industry focus, Westpac continues to engage with AUSTRAC and has been undertaking a review of its AML/CTF control environment that is designed to consider and assess our AML/CTF policies, the completeness of data feeding into our AML/CTF systems and our anti-money laundering and counter-terrorism financing processes and controls. Westpac has been regularly updating AUSTRAC on the progress of this review and has commenced implementing a number of improvements to its AML/CTF policies, systems and controls together with related remediation work in respect of certain reporting practices. These efforts have related to matters such as customer on-boarding and ongoing customer due diligence.

The Group has recently self-reported to AUSTRAC a failure to report a large number of International Funds Transfer Instructions (IFTIs) (as required under Australia's AML/CTF Act) in relation to one WIB product. These IFTIs relate to batch instructions received from 2009 until recently from a small number of correspondent banks for payments made predominantly to beneficiaries in Australia in Australian dollars. Through the product, Westpac facilitates payments on behalf of clients of certain of its correspondent banks. The majority of the payments are low value and made by Government pension funds and corporates. The Group is investigating and working with AUSTRAC to remediate the failure to report IFTIs. Further details regarding the consequences of the failure to comply with financial crime obligations are set out in the Risk Factors section of this report.

23.    The 2018 20-F stated the following regarding anti-money laundering regulation

and related requirements:

> Westpac has a Group-wide program to manage its obligations under the Anti-Money Laundering and Counter-Terrorism Financing Act 2006 (Cth). We continue to actively engage with the regulator, AUSTRAC, on our activities.
>
> Our Anti-Money Laundering and Counter-Terrorism Financing Policy (AML/CTF Policy) sets out how the Westpac Group complies with its legislative obligations.
>
> The AML/CTF Policy applies to all business divisions and employees (permanent, temporary and third party providers) working in Australia, New Zealand and overseas.
>
> United States
>
> The USA PATRIOT Act of 2001 requires US financial institutions, including the US branches of foreign banks, to take certain steps to prevent, detect and report individuals and entities involved in international money laundering and the financing of terrorism. The required actions include verifying the identity of financial institutions and other customers and counterparties, terminating correspondent accounts for foreign 'shell banks' and obtaining information about the owners of foreign bank clients and the identity of the foreign bank's agent for service of process in the US. The anti-money laundering compliance requirements of the USA PATRIOT Act include requirements to adopt and implement an effective anti-money laundering program, report suspicious transactions or activities, and implement due diligence procedures for correspondent and other customer accounts. Westpac's New York branch and Westpac Capital Markets LLC maintain an anti-money laundering compliance program designed to address US legal requirements.
>
> US economic and trade sanctions, as administered by the Office of Foreign Assets Control (OFAC), prohibit or significantly restrict US financial institutions, including the US branches and operations of foreign banks, and other US persons from doing business with certain persons, entities and jurisdictions. Westpac's New York branch and Westpac Capital Markets LLC maintain compliance programs designed to comply with OFAC sanctions programs, and Westpac has a Group-wide program to ensure adequate compliance.

24.    On May 6, 2019, the Company held a conference call to discuss the Company's

interim 2019 financial results. During the call, Defendant Hartzer downplayed the Company's

interaction with AUSTRAC, stating, in pertinent part:

We also have a few regulatory and compliance issues to work through. These include things like the responsible lending and general advice cases and an issue we're working through with AUSTRAC on a failure in WIB to report certain domestic payments that we made on behalf of a small number of international correspondent banks.

25.    On November 6, 2019, Westpac filed with the SEC its Annual Report on Form 20-F for the fiscal year ended September 30, 2018 (the "2019 20-F"). Attached to the 2019 20-F were SOX certifications signed by Defendants Hartzer and King attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

26.    The 2019 20-F stated the following regarding financial crime:

In an environment of ongoing legislative reform, regulatory change and increased industry focus, Westpac continues to progress a program of work to improve its management of financial crime risks (including Anti-Money Laundering and Counter-Terrorism Financing (AML/CTF), sanctions, Anti-Bribery and Corruption, FATCA and Common Reporting Standards). This work includes a review of our AML/CTF policies, the completeness of data feeding into our AML/CTF systems and our AML/CTF processes and controls. Westpac has been regularly updating AUSTRAC on progress and continues to implement a number of improvements to its AML/CTF Program, governance, policies, systems and controls together with related remediation work in respect of certain controls and reporting practices. These efforts relate to matters such as customer on-boarding, customer and payment screening; ongoing customer due diligence, transaction monitoring and regulatory reporting (including in relation to International Funds Transfer Instructions (IFTIs), Suspicious Matter Reports and Threshold Transaction Reports).

As reported in the Group's 2018 Annual Report, the Group self-reported to AUSTRAC a failure to report a large number of IFTIs (as required under Australia's AML/CTF Act). Under the Act, the 'sender' financial institution of an IFTI transmitted out of Australia, or the 'recipient' financial institution of an IFTI transmitted into Australia, is required to report the IFTI to AUSTRAC within 10 business days of the instruction being sent or received. The majority of the IFTIs which are the subject of the Group's engagement with AUSTRAC, concern batch instructions received by Westpac through one WIB product between 2009 and 2018 from a small number of correspondent banks for payments made predominantly to beneficiaries living in Australia in Australian dollars, on behalf of clients of those correspondent banks. The majority of the payments were low value, recurring and made by foreign government pension funds and corporates.

AUSTRAC has issued a number of detailed statutory notices over the last year requiring information relating to the Group's processes, procedures and oversight. These notices relate to a range of matters including these IFTI reporting failures and associated potential failings related to record keeping and obligations to obtain and pass on certain data in funds transfer instructions, as well as correspondent banking due diligence, risk assessments and transaction monitoring. Westpac has not yet received an indication from AUSTRAC about the nature of any enforcement action it may take. The Group is continuing to work with AUSTRAC in relation to these matters.

Any enforcement action against Westpac may include civil penalty proceedings and result in the payment of a significant financial penalty, which Westpac is currently unable to reliably estimate. Previous enforcement action by AUSTRAC against other institutions has resulted in a range of outcomes, depending on the nature and severity of the relevant conduct and its consequences.

Further information about these matters is set out in Note 27 to the financial statements. Details about the consequences of failing to comply with financial crime obligations is set out in 'Risk Factors' in section 2.

27.     The 2019 20-F stated the following regarding anti-money laundering regulation

and related requirements:

Australia

Westpac has a Group-wide program to manage its obligations under the Anti-Money Laundering and Counter- Terrorism Financing Act 2006 (Cth). We continue to actively engage with the regulator, AUSTRAC, on our activities.

Our Anti-Money Laundering and Counter-Terrorism Financing Policy (AML/CTF Policy) sets out how the Westpac Group complies with its legislative obligations.

The AML/CTF Policy applies to all business divisions and employees (permanent, temporary and third party providers) working in Australia, New Zealand and overseas.

United States

The USA PATRIOT Act of 2001 requires US financial institutions, including the US branches of foreign banks, to take certain steps to prevent, detect and report individuals and entities involved in international money laundering and the financing of terrorism. The required actions include verifying the identity of financial institutions and other customers and counterparties, terminating correspondent accounts for foreign 'shell banks' and obtaining information about the owners of foreign bank clients and the identity of the foreign bank's agent for

service of process in the US. The anti-money laundering compliance requirements of the USA PATRIOT Act include requirements to adopt and implement an effective anti-money laundering program, report suspicious transactions or activities, and implement due diligence procedures for correspondent and other customer accounts. Westpac's New York branch and Westpac Capital Markets LLC maintain an anti-money laundering compliance program designed to address US legal requirements.

US economic and trade sanctions, as administered by the Office of Foreign Assets Control (OFAC), prohibit or significantly restrict US financial institutions, including the US branches and operations of foreign banks, and other US persons from doing business with certain persons, entities and jurisdictions. Westpac's New York branch and Westpac Capital Markets LLC maintain compliance programs designed to comply with OFAC sanctions programs, and Westpac has a Group-wide program to ensure adequate compliance.

28.     The statements contained in ¶¶15-27 were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operations and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) contrary to Australian law, the Company failed to report over 19.5 million international funds transfer instructions to AUSTRAC; (2) the Company did not appropriately monitor and assess the ongoing money laundering and terrorism financing risks associated with movement of money into and out of Australia; (3) the Company did not pass on requisite information about the source of funds to other banks in the transfer chain; (4) despite being aware of the heightened risks, the Company did not carry out appropriate due diligence on transactions in South East Asia and the Philippines that had known financial indicators relating to child exploitation risks; (5) the Company's AML/CTF Program was inadequate to identify, mitigate and manage money laundering and terrorism financing risks; and (6) as a result, Defendants' statements about its business, operations, and prospects, were materially false and misleading and/or lacked a reasonable basis at all relevant times.

## THE TRUTH EMERGES

29.    On November 19, 2019, after market hours, AUSTRAC, Australia's anti money-laundering and terrorism financing regulator, filed a civil action in Australian Court alleging over 23 million breaches of Australian AML/CTF legislation, including a failure to report over 19.5 million international fund transfer, failing to perform enhanced due diligence on correspondent banks in high-risk jurisdictions, and potentially providing services used in the exploitation of children in South East Asia and the Philippines. AUSTRAC's media release provided, in pertinent part, the following:

> AUSTRAC, Australia's anti money-laundering and terrorism financing regulator, has today applied to the Federal Court of Australia for civil penalty orders against Westpac Banking Corporation (Westpac).
>
> The civil penalty orders relate to systemic non-compliance with the Anti-Money Laundering and Counter-Terrorism Financing Act 2006 (AML/CTF Act). AUSTRAC alleges Westpac contravened the AML/CTF Act on over 23 million occasions.
>
> AUSTRAC Chief Executive Officer, Nicole Rose, says that AUSTRAC's decision to commence civil penalty proceedings was made following a detailed investigation into Westpac's non-compliance.
>
> Westpac failed to:
>
> 1.  appropriately assess and monitor the ongoing money laundering and terrorism financing risks associated with the movement of money into and out of Australia through correspondent banking relationships. Westpac has allowed correspondent banks to access its banking environment and the Australian Payments System without conducting appropriate due diligence on those correspondent banks and without appropriate risk assessments and controls on the products and channels offered as part of that relationship.
> 2.  report over 19.5 million International Funds Transfer Instructions (IFTIs) to AUSTRAC over nearly five years for transfers both into and out of Australia. The late incoming IFTIs received from four correspondent banks alone represent over 72% of all incoming IFTIs received by Westpac in the period November 2013 to September 2018 and amounts to over $11 billion dollars. IFTIs are a key source of information from the financial services sector that

provides vital information into AUSTRAC's financial intelligence to protect Australia's financial system and the community from harm.

3. pass on information about the source of funds to other banks in the transfer chain. This conduct deprived the other banks of information they needed to understand the source of funds to manage their own AML/CTF risks.

4. keep records relating to the origin of some of these international funds transfers.

5. carry out appropriate customer due diligence on transactions to the Philippines and South East Asia that have known financial indicators relating to potential child exploitation risks. Westpac failed to introduce appropriate detection scenarios to detect known child exploitation typologies, consistent with AUSTRAC guidance and their own risk assessments.

It is alleged that Westpac's oversight of the banking and designated services provided through its correspondent banking relationships was deficient. Westpac's oversight of its AML/CTF Program, intended to identify, mitigate and manage the money laundering and terrorism financing risks of its designated services, was also deficient. These failures in oversight resulted in serious and systemic non-compliance with the AML/CTF Act.

"These AML/CTF laws are in place to protect Australia's financial system, businesses and the community from criminal exploitation. Serious and systemic non-compliance leaves our financial system open to being exploited by criminals," Ms Rose said.

"The failure to pass on information about IFTIs to AUSTRAC undermines the integrity of Australia's financial system and hinders AUSTRAC's ability to track down the origins of financial transactions, when required to support police investigations."

AUSTRAC's approach to regulation is based on building resilience in the financial system and on educating the financial services sector to ensure they understand, and are able to comply with, their compliance and reporting obligations. Businesses are the first line of defence in protecting the financial system from abuse.

"We have been, and will continue to work with Westpac during these proceedings to strengthen their AML/CTF processes and frameworks," Ms Rose said.

"Westpac disclosed issues with its IFTI reporting, has cooperated with AUSTRAC's investigation and has commenced the process of uplifting its AML/CTF controls."

Westpac is a member of the Fintel Alliance. The Fintel Alliance is a private-public partnership established by AUSTRAC to tackle serious financial crime, including money laundering and terrorism financing.

30.     According to the regulator, Westpac failed to carry out due diligence checks on at least twelve customers relating to low-value payments made through one its systems, LitePay. AUSTRAC stated that "[o]ver a number of years, there were repeated patterns of frequent low value transactions on accounts held by each of these 12 customers that were indicative of child exploitation risks." AUSTRAC also alleged Westpac was aware of the heightened child exploitation risks since at least 2013, and that in June 2016, "senior management within Westpac was *specifically briefed* on these risks with respect to the LitePay channel." (emphasis added).

31.     AUSTRAC also alleged that in spite of this awareness, "Westpac did not implement appropriate automated detection scenarios for the LitePay channel until June 2018 and is yet to implement appropriate automated detection scenarios across other international payment channels."

32.     On this news, Westpac ADRs fell $1.25 per share over the next three trading days or over 7.13% to close at $16.67 per ADR on November 22, 2019, damaging investors.

33.     On November 22, 2019, Westpac's management board "unreservedly" apologized for the conduct, stating, in pertinent part:

> The Westpac Board of Directors today met to further discuss the issues raised by AUSTRAC in its statement of claim and the urgent response plan which has commenced.
>
> Westpac's Chairman, Lindsay Maxsted, said: "As a Board, and as individuals, we are devastated by the issues raised by AUSTRAC in its recent statement of claim.
>
> "The notion that any child has been hurt as a result of any failings by Westpac is deeply distressing and we are truly sorry. The Board unreservedly apologises.
>
> "Our Board, CEO, and management team are fully committed to fixing these issues and we are taking all steps necessary to urgently close any remaining gaps and fix our policies and procedures so that this can never happen again.

"We have already made significant improvements, including reviewing and taking action on all of the individual customers mentioned by AUSTRAC and establishing a multi-layered review.

"This review includes accelerating our ongoing program of AML/CTF improvements and we will provide public updates on our progress.

"In addition, we will appoint independent experts to oversee the program including a review of accountability. We will take actions emerging from that review. An assessment of suitably qualified candidates to lead that review is underway.

"We have also commenced discussions with relevant community groups about any further steps we can take to fight child exploitation.

"We are continuing to work closely with AUSTRAC to accelerate resolution of the matter.

"The Board will provide an update in coming days to share more information on what has occurred and what steps we are taking."

34.     On November 25, 2019, Defendant Hartzer announced he was stepping down as a result of the scandal.

35.     On November 28, 2019, new evidence emerged that an internal Westpac memo showed that the Company was aware that its process for reporting international transfers was inadequate, that the bank was responsible for six million additional breaches that could not be prosecuted due to statute of limitation claims, and that a number of staff members knew that some payments were not being reported, but the information was not escalated. *News.com.au* published an article summarizing the additional evidence, stating, in pertinent part:

> Westpac took 15 long months to report potentially dodgy international transactions and was behind six million more serious breaches than previously believed, according to explosive new claims.
>
> The 200-year-old lender has dominated headlines for days after financial watchdog AUSTRAC alleged it failed to investigate customers who made transactions possibly linked to child exploitation in the Philippines and South-East Asia.

According to the *Australian Financial Review*, some payments may have gone towards "live-streamed child abuse".

The lender is also accused of breaching money laundering and counter-terrorism finance laws, with Westpac publicly accused of 23 million breaches in total.

*The crisis deepened when comments allegedly made by chief executive Brian Hartzer to senior staff were leaked to The Australian, including claims the scandal "was not playing out as a high street issue" and that the Westpac board "don't need to overcook this" because "for people in mainstream Australia going about their daily lives, this is not a major issue".*

The saga has claimed Mr Hartzer's job, along with chairman Lindsay Maxsted, who will bring forward his retirement to the first half of next year.

But new claims reported today reveal the scandal runs even deeper than first thought.

*According to the Australian Financial Review, "confidential letters" sent by Westpac to AUSTRAC reveal the bank was responsible for 29 million breaches in total – six million more than has been publicly reported so far.*

*However, that extra six million can't be prosecuted because they fall outside the statute of limitations.*

The publication also reports the documents – which summarise Westpac's own investigation into the problem – allege a bungled 2011 IT update meant automatic reporting for certain payments known as international funds transfer instructions (IFTIs) with a number of banks failed.

The issue went undetected for six years, and took an extra year to be fixed – but by that time, Westpac already racked up a "theoretical" $40 trillion penalty, which the *Australian Financial Review* explains is based on "the legislative penalty of $17 million to $21 million for failing to notify AUSTRAC within 10 days of an international money transfer".

*The documents also allegedly show a number of junior staff members discovered that some payments weren't being reported, but the information was not escalated.*

## DAMNING MEMO

*On top of those revelations, The Australian also claims an internal Westpac breach system memo shows the bank knew the "end-to-end" process for reporting international transfers to AUSTRAC was "not clearly understood" by high-level staffers as far back as mid-2017.*

*"As a result, management does not have a complete view of the risks to IFTIs reporting and may not fully understand the impact of changes to data on IFTIs reporting, potentially resulting in noncompliance," the memo states.*

"There are gaps in coverage and understanding of responsibilities across the end-to-end data flow and reporting process for IFTIs."

Yesterday, Westpac was accused of "hypocrisy" for hosting an extravagant lunch dedicated to the fight against human trafficking in 2016, while potentially helping to facilitate child sex trafficking behind the scenes.

US-based reporter and globally recognised human trafficking expert Christine Dolan was the guest speaker at the glittering event, and since the lunch was held, the bank has also released an annual "Slavery and Human Trafficking" statement touting its "zero tolerance" for the criminal practice.

The Westpac website also boasts a commitment to a slew of noble causes, including the environment and sustainability, human rights and indigenous reconciliation – but the unfolding scandal prompted a slew of commentators and members of the public to slam the bank's "virtue signalling".

In another embarrassing twist, Westpac was also caught advertising for a Financial Crime Program job in the midst of the massive child exploitation scandal.

"Westpac is passionate about financial crime and recognises that we have a responsibility to protect our communities from criminals who seek to use bank systems to store, obtain and move money," the job ad, which is still visible on LinkedIn, states.

And today, there are renewed calls for more directors to step down from Westpac's board in the wake of the crisis, with the *Sydney Morning Herald* reporting proxy advice firms are now pushing for shareholders vote against the re-election of board members Peter Marriott and Nerida Ceasar.

(Emphasis added).

36.     On December 17, 2019, the Australian Prudential Regulation Authority ordered Westpac to set aside an extra $500 million in capital to "reflect the heightened operational risk profile of the bank" as it investigates the Company's conduct.

37.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's common shares, Plaintiff and other Class members have suffered significant losses and damages.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

38.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons other than defendants who acquired Westpac securities publicly traded on NYSE during the Class Period, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of Westpac, members of the Individual Defendants' immediate families and their legal representatives, heirs, successors or assigns and any entity in which Officer or Director Defendants have or had a controlling interest.

39.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Westpac securities were actively traded on NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds, if not thousands of members in the proposed Class.

40.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

41.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

42.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the Exchange Act were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the financial condition and business of Westpac;

- whether Defendants' public statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

- whether the Defendants caused Westpac to issue false and misleading filings during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false filings;

- whether the prices of Westpac securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

43.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

44.     Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Westpac shares met the requirements for listing, and were listed and actively traded on the NYSE, an efficient market;

- As a public issuer, Westpac filed periodic public reports;

- Westpac regularly communicated with public investors via established market communication mechanisms, including through the regular dissemination of press releases via major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

- Westpac's securities were liquid and traded with moderate to heavy volume during the Class Period; and

- Westpac was followed by a number of securities analysts employed by major brokerage firms who wrote reports that were widely distributed and publicly available.

45.     Based on the foregoing, the market for Westpac securities promptly digested current information regarding Westpac from all publicly available sources and reflected such information in the prices of the shares, and Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

46.     Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128 (1972), as Defendants omitted material information in

their Class Period statements in violation of a duty to disclose such information as detailed above.

**COUNT I**
**For Violations of Section 10(b) And Rule 10b-5 Promulgated Thereunder**
**Against All Defendants**

47.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

48.     This Count is asserted against Defendants is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

49.     During the Class Period, Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

50.     Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

- employed devices, schemes and artifices to defraud;

- made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

- engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of Westpac securities during the Class Period.

51.     Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of Westpac were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing

public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These defendants by virtue of their receipt of information reflecting the true facts of Westpac, their control over, and/or receipt and/or modification of Westpac's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning Westpac, participated in the fraudulent scheme alleged herein.

52.     Individual Defendants, who are the senior officers and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other Westpac personnel to members of the investing public, including Plaintiff and the Class.

53.     As a result of the foregoing, the market price of Westpac securities was artificially inflated during the Class Period. In ignorance of the falsity of Defendants' statements, Plaintiff and the other members of the Class relied on the statements described above and/or the integrity of the market price of Westpac securities during the Class Period in purchasing Westpac securities at prices that were artificially inflated as a result of Defendants' false and misleading statements.

54.     Had Plaintiff and the other members of the Class been aware that the market price of Westpac securities had been artificially and falsely inflated by Defendants' misleading statements and by the material adverse information which Defendants did not disclose, they

would not have purchased Westpac securities at the artificially inflated prices that they did, or at all.

55.    As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

56.    By reason of the foregoing, Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchase of Westpac securities during the Class Period.

## COUNT II
### Violations of Section 20(a) of the Exchange Act
### Against the Individual Defendants

57.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

58.    During the Class Period, the Individual Defendants participated in the operation and management of Westpac, and conducted and participated, directly and indirectly, in the conduct of Westpac's business affairs. Because of their senior positions, they knew the adverse non-public information about Westpac's misstatement of revenue and profit and false financial statements.

59.    As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Westpac's financial condition and results of operations, and to correct promptly any public statements issued by Westpac which had become materially false or misleading.

60.    Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Westpac disseminated in the marketplace during the Class

Period concerning Westpac's results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Westpac to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of Westpac within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Westpac securities.

61.     By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Westpac.

## PRAYER FOR RELIEF

**WHEREFORE**, plaintiff, on behalf of himself and the Class, prays for judgment and relief as follows:

(a)     declaring this action to be a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and designating plaintiff's counsel as Lead Counsel;

(b)     awarding damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, together with interest thereon;

awarding plaintiff and the Class reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)     awarding plaintiff and other members of the Class such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: January 30, 2020                    Respectfully submitted,

RANSOM GILBERTSON, MARTIN &
RATLIFF LLP
By:
Jeffrey S. Ratliff
8401 NE Halsey Street Suite 208
Portland, OR 97220
T: 503-226-3664

**THE ROSEN LAW FIRM, P.A.**
Laurence M. Rosen, Esq.
Phillip Kim, Esq.
275 Madison Avenue, 40th Floor
New York, NY 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: lrosen@rosenlegal.com
        pkim@rosenlegal.com

*Counsel for Plaintiff*

# Certification and Authorization of Named Plaintiff Pursuant to Federal Securities Laws

The individual or institution listed below (the "Plaintiff") authorizes and, upon execution of the accompanying retainer agreement by The Rosen Law Firm P.A., retains The Rosen Law Firm P.A. to file an action under the federal securities laws to recover damages and to seek other relief against Westpac Banking Corporation. The Rosen Law Firm P.A. will prosecute the action on a contingent fee basis and will advance all costs and expenses. The Westpac Banking Corporation. Retention Agreement provided to the Plaintiff is incorporated by reference, upon execution by The Rosen Law Firm P.A.

| | |
|---|---|
| **First name:** | John |
| **Middle initial:** | |
| **Last name:** | Byrne |
| **Address:** | |
| **City:** | |
| **State:** | |
| **Zip:** | |
| **Country:** | |
| **Facsimile:** | |
| **Phone:** | |
| **Email:** | |



Plaintiff certifies that:

1. Plaintiff has reviewed the complaint and authorized its filing.
2. Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.
3. Plaintiff is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.
4. Plaintiff represents and warrants that he/she/it is fully authorized to enter into and execute this certification.
5. Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.
6. Plaintiff has made no transaction(s) during the Class Period in the debt or equity securities that are the subject of this action except those set forth below:

Acquisitions:

| Type of Security | Buy Date | # of Shares | Price per Share |
|---|---|---|---|
| Common Stock | 11/07/2019 | 500 | 18.68 |
| Common Stock | 08/28/2018 | 500 | 20.0685 |
| Common Stock | 08/27/2018 | 500 | 20.73 |
| Common Stock | 08/14/2018 | 500 | 21.46 |

**Certification for John Byrne (cont.)**

Sales:

| Type of Security | Sale Date | # of Shares | Price per Share |
|---|---|---|---|
| Common Stock | 11/26/2019 | 1000 | 16.5851 |

7. I have not served as a representative party on behalf of a class under the federal securities laws during the last three years, except if detailed below. [ ]

I declare under penalty of perjury, under the laws of the United States, that the information entered is accurate: **YES**

By clicking on the button below, I intend to sign and execute this agreement and retain the Rosen Law Firm, P.A. to proceed on Plaintiff's behalf, on a contingent fee basis. **YES**

Signed pursuant to California Civil Code Section 1633.1, et seq. - and the Uniform Electronic Transactions Act as adopted by the various states and territories of the United States.

Date of signing: 01/30/2020