**UNITED STATES DISTRICT COURT**
**DISTRICT OF OREGON**

| | |
|---|---|
| JOHN BYRNE, Individually and on behalf of all others similarly situated,<br><br>      Plaintiff,<br><br>      v.<br><br>WESTPAC BANKING CORPORATION, BRIAN CHARLES HARTZER, and PETER FRANCIS KING,<br><br>      Defendants. | **Case No: 3:20-cv-00171-AC** |

**DECLARATION OF SARA FUKS IN SUPPORT OF PLAINTIFFS' MOTIONS FOR: (1) FINAL APPROVAL OF PROPOSED CLASS ACTION SETTLEMENT AND PLAN OF ALLOCATION; AND (2) AN AWARD OF ATTORNEYS' FEES, REIMBURSEMENT EXPENSES, AND AWARD TO LEAD PLAINTIFF**

I, SARA FUKS, declare as follows pursuant to 28 U.S.C. §1746:

1.      I am counsel at The Rosen Law Firm, P.A. ("The Rosen Law Firm"), court-appointed Lead Counsel for Lead Plaintiff Edward Davies ("Davies" or "Lead Plaintiff") and Named Plaintiff John Byrne ("Byrne" and with Davies, "Plaintiffs") and the proposed Settlement Class,[1] and am admitted to appear *pro hac vice* before this Court. I have personal knowledge of the matters I declare herein.

2.      Pursuant to Rule 23 of the Federal Rules of Civil Procedure, I submit this declaration in support of Plaintiffs' Motions For: (1) Final Approval of Class Action Settlement and Plan of

---

[1] All capitalized terms not otherwise defined herein shall have the same meanings set forth and defined in the Stipulation and Agreement of Settlement, filed on October 12, 2020 (the "Stipulation") (Dkt. No. 29-4).

Allocation of Settlement; and (2) an Award of Attorneys' Fees, Reimbursement of Expenses, and award to Lead Plaintiff.

## I.    PRELIMINARY STATEMENT: THE EXCELLENT RECOVERY ACHIEVED

3.    Plaintiffs and Lead Counsel achieved the $3.1 million all cash Settlement after they: (a) thoroughly investigated Defendants, including reviewing publicly available information, to initiate the action; (b) retained a private investigator and financial expert regarding damages, market efficiency, price impact, and loss causation, to draft and prepare an amended complaint; (c) prepared a detailed mediation statement; and (d) participated in arms'-length negotiations to resolve the Action with the assistance of Jed Melnick of JAMS, a well-respected and experienced mediator.

4.    The Complaint[2] asserts violations of §§10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§78j(b), 78t(a), and Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5 against Defendants. The Complaint alleges, among other things, that during the Settlement Class Period, Defendants made materially false and misleading statements about Westpac's policies concerning and compliance with anti-money laundering and counterterrorism financing ("AML/CTF") laws. The Complaint further alleges that the prices of Westpac's publicly traded American Depository Receipts ("ADRs") were artificially inflated as a result of Defendants' allegedly false and misleading statements, and allegedly declined when the truth was revealed. Defendants deny those allegations and claims.

5.    In my view, this Declaration demonstrates why the Settlement is fair, reasonable, and adequate and should be approved by the Court, as well as why Lead Counsel's fee and expense request and Award to Lead Plaintiff are reasonable and should be approved by the Court. Plaintiffs

---

[2] "Complaint" means the Complaint for Violations of the Federal Securities Laws (Dkt. No. 1). Plaintiffs cite to the pertinent allegations in the Complaint as "¶ _" or "¶¶ _."

DECLARATION OF SARA FUKS IN SUPPORT OF PLAINTIFFS' MOTIONS FOR: (1) FINAL APPROVAL OF PROPOSED CLASS ACTION SETTLEMENT AND PLAN OF ALLOCATION; AND (2) AN AWARD OF ATTORNEYS' FEES, REIMBURSEMENT EXPENSES, AND AWARD TO LEAD PLAINTIFF

and Lead Counsel, experienced securities class action practitioners, achieved this favorable Settlement after having a firm understanding of the strengths and weaknesses of the case and engaging in arm's-length negotiations and a mediation with Mr. Melnick serving as mediator.

6.      The $3.1 million Settlement Amount represents a recovery of between 14.3% and 21.6% of the $15 million to $21.6 million of Plaintiffs' estimated aggregate damages. This recovery is in-line with if not exceeds settlements of a similar size. According to Cornerstone Research, *Securities Class Action Settlements: 2019 Review and Analysis*, (submitted to the Court as Docket No. 29-6) in 2019 the median settlement as a percentage of damages for securities class actions with damages under $25 million was 12.8%.

7.      Plaintiffs and Lead Counsel support the Settlement as it provides the Settlement Class with a guaranteed recovery while avoiding the risks associated with costly, protracted, complex litigation.

8.      As I discuss in more detail in Section V, *infra*, Plaintiffs faced the risks that they would fail to: (a) defeat Defendants' anticipated motion(s) to dismiss, (b) achieve class certification and maintain it through a verdict, (c) defeat Defendants' anticipated summary judgment motion, (d) prevail at trial, and (e) defend any favorable verdict on post-trial motions and appeal. On the motion to dismiss, Plaintiffs would have meet the PSLRA's heightened pleading standards in alleging violations of the Exchange Act.  At summary judgment and trial, for example, Plaintiffs risked failing to prove the elements of scienter, *i.e.*, that during the Settlement Class Period Defendants did not act with the required state of mind, and loss causation, *i.e.*, adequately linking Defendants' misconduct to the decline in the market price for Westpac ADRs, or to establish the Settlement Class's full damages. More, summary judgment and trial will require the presentation of expert testimony about anti-money laundering and counter-terrorism financing laws and banking regulations, loss causation,

and damages, risking multiple battles of experts that may confound the jury. Accordingly, in the absence of a settlement, the risk existed that the Settlement Class could have recovered nothing or an amount significantly less than the negotiated Settlement.

9.      Plaintiffs and Lead Counsel considered these issues in deciding to settle the Action for $3.1 million. Considering all the circumstances and risks both sides faced if litigation continued, Plaintiffs and Defendants concluded that settlement on the terms upon which they agreed was in their respective best interests.

10.     Lead Counsel and Local Counsel, Ransom, Gilbertson, Martin & Ratliff, LLP ("Ransom Firm" collectively, "Plaintiffs' Counsel"), prosecuted this Action on a contingent basis and advanced all litigation expenses, shouldering completely the risk of failure.

11.     The Court should grant Lead Counsel's fee application of one-third ($33^{1/3}\%$) of the Settlement as it is fair and reasonable. Lead Counsel's efforts, at their financial risk, conferred a significant benefit on the Settlement Class. This fee request is within the range of fee percentages frequently awarded in this type of action. Additionally, Plaintiffs' Counsel in total expended 537.7 hours of attorney and other professional time and $24,776.41 in out-of-pocket expenses necessary to litigate this complex action. Thus, the Court should reimburse Plaintiffs' Counsel for these litigation expenses.

12.     The Court should also award a payment to Lead Plaintiff of $1,500 to compensate him for his efforts including the time he dedicated to litigating the Action on behalf of the Settlement Class. This request aligns with similar requests in other district courts in the Ninth Circuit.

II.     **FACTUAL BACKGROUND**

    A. **Summary of Plaintiffs' Claims**

13.     The Complaint alleges that Defendants made false and misleading statements to

investors about Westpac's policies concerning, and compliance with applicable anti-money laundering and counter-terrorism financing ("AML/CTF") laws.

14.     The Complaint alleges that on November 19, 2019, after market hours, AUSTRAC, Australia's anti-money laundering and terrorism financing regulator, filed a civil action in Australian Court alleging over 23 million breaches of AML/CTF legislation. ¶29. The Complaint alleges that on this news, Westpac ADRs fell over 7.13%. ¶32.

15.     Defendants deny the allegations and claims in the Complaint and maintain that their public disclosures, including with regard to Westpac's policies concerning, and compliance with AML/CTF laws in Australia, were in no way false or misleading when made. The present Settlement is not an admission of any wrongdoing or liability of any kind, by any Defendant.

## III.     PROCEDURAL HISTORY

16.     Named Plaintiff Byrne commenced this action on January 30, 2020 alleging violations of §§ 10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder on behalf of a class of all purchasers of Westpac ADRs between November 11, 2015 and November 19, 2019, both dates inclusive. (Dkt. No. 1).

17.     On March 30, 2020, Edward Davies filed a motion for appointment as lead plaintiff and approval of his selection of the Rosen Law Firm as lead counsel for the Class. (Dkt. No. 11). By Order dated April 16, 2020, Magistrate Judge John V. Acosta granted Davies' motion. (Dkt. No. 21).

18.     On April 20, 2020, Judge Acosta entered an order requiring the Parties to file a proposed scheduling order by July 6, 2020. (Dkt. No. 22). On July 7, 2020, Judge Acosta entered an order setting a pleading and briefing schedule which set a deadline of July 30, 2020 for Plaintiffs to file an amended complaint. (Dkt. No 25).

19.     On July 29, 2020 the Parties informed the Court of their intent to schedule a mediation

to resolve the action and requested a 30-day extension to the case schedule, which Judge Acosta so-ordered the following day. (Dkt. No. 26).

20. On August 13, 2020 the Parties attended a mediation before mediator Jed Melnick. The mediation was successful and the Parties agreed to this Settlement.

21. On October 12, 2020, Plaintiffs' filed their Consented Motion for Preliminary Approval of Proposed Class Action Settlement ("Preliminary Approval Motion") (Dkt. No. 29). On November 5, 2021, the Court entered the Amended Order Preliminarily Approving Class Action Settlement ("Preliminary Approval Order") (Dkt. No. 31).

## IV. PLAINTIFFS' COMPLIANCE WITH THE PRELIMINARY APPROVAL ORDER AND REACTION OF THE SETTLEMENT CLASS TO DATE

22. Pursuant to and in compliance with the Preliminary Approval Order, the Court-appointed Claims Administrator, Strategic Claims Services ("SCS") mailed the Postcard Notice to potential Settlement Class Members, published Summary Notice of (i) Pendency of Class Action and Proposed Settlement; (ii) Settlement Hearing; and (iii) Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses ("Summary Notice") in *Investor's Business Daily* and on *PR Newswire*, and posted a URL it dedicated to this Settlement containing the Notice of (I) Pendency of Class Action and Proposed Settlement; (II) Settlement Hearing; and (III) Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses, ("Long Notice") and the Proof of Claim and Release Form ("Proof of Claim"). *See* Declaration of Josephine Bravata Concerning: (A) Mailing of the Postcard Notice; (B) Publication of the Summary Notice; and (C) Report on Requests for Exclusion and Objections ("Bravata Decl." or "Bravata Declaration"), attached hereto as **Exhibit 1**.

23. The Notice[3] described the claims Plaintiffs asserted, providing an overview of the

---

[3] "Notice" means collectively the Long Notice, Summary Notice, and Postcard Notice.

litigation, the Settlement's terms, the request for attorneys' fees of no more than one-third of the Settlement Fund, reimbursement of expenses up to $40,000 including reimbursement to the Plaintiffs for their reasonable costs and expenses due to their representation in the Action. The Notice further explains the rights of and process for Settlement Class Members filing a claim, objecting to the Settlement, or requesting exclusion from the Settlement Class. The Long Notice, attached to the Bravata Declaration as Exhibit D, includes the comprehensive Plan of Allocation, detailing how SCS, under the Rosen Law Firm's direction, will divide and distribute the Net Settlement Amount.

24.     To ascertain the members of the Settlement Class to whom SCS distributed Notice, first, SCS contacted 1,308 nominees, including 706 banks and brokerage companies as well as 602 mutual funds, insurance companies, pension funds, and money managers. Bravata Decl. ¶3. From the names it received, SCS: (1) emailed the Summary Notice to 8,331 clients of one of the nominees; (2) emailed a direct link from the webpage for the Notice and Claim form for another of the nominees to 26,607 of its client and (3) mailed 84,341 Postcard Notices to potential Settlement Class Members. Bravata Decl. ¶4.   In total, SCS notified 118,279 potential Settlement Class Members of the Settlement either by Postcard Notice or email of Summary Notice/link of Notice and Claim Form. *Id.*

25.     On November 23, 2020, SCS published Summary Notice electronically over *PR Newswire* and in print in *Investor's Business Daily*. *Id.* at ¶7, Exhibit C.

26.     SCS also maintains and posted to a Settlement-dedicated URL a summary of the Settlement, the Long Notice, Proof of Claim, Stipulation, and the Preliminary Approval Order. *Id*. at ¶8.

27.     Pursuant to the Preliminary Approval Order, Settlement Class Members had until March 8, 2021 to request exclusion and until March 30, 2021 to submit objections to any aspect of

DECLARATION OF SARA FUKS IN SUPPORT OF PLAINTIFFS' MOTIONS FOR: (1) FINAL APPROVAL OF PROPOSED CLASS ACTION SETTLEMENT AND PLAN OF ALLOCATION; AND (2) AN AWARD OF ATTORNEYS' FEES, REIMBURSEMENT EXPENSES, AND AWARD TO LEAD PLAINTIFF

the Settlement including awarding of fees and expenses. *Id.* at ¶¶10-11. To date, SCS, counsel, and it also appears the Court, have not received any objections to the Settlement.  In addition, only nine potential Settlement Class members requested exclusion. *Id* at 10. However, only one out of these nine Settlement Class Members held their shares through the alleged corrective disclosure. Accordingly, only one of the purportedly excluded Settlement Class Members' shares were allegedly damaged and would have recognized losses (of $80.00).  The remaining 8 Settlement Class Members requesting exclusion are not eligible to receive any recovery pursuant to the Settlement. These exclusion requests do not trigger the termination threshold in ¶40 of the Stipulation. If we receive any objections or further exclusion requests, we will address them in Plaintiffs' reply papers in further support of Final Approval.

## V.    PLAINTIFFS FACED RISKS IN THIS ACTION IF LITIGATION CONTINUED

### A.    The Risk of Establishing Liability and Damages

28.    Prior to reaching the Settlement, Plaintiffs, through Lead Counsel, extensively reviewed an analyzed publicly available information about Westpac, including: (1) all relevant Westpac filings with the SEC; (2) Westpac's other public statements, including press releases and transcripts of Westpac's investor calls; (3) reports of securities and financial analysts; (4) news articles and other commentary and analysis regarding Westpac; and (5) Australian Court documents filed in connection with proceedings involving Westpac in Australia. Lead Counsel retained consultants and experts to theorize about market efficiency, price impact, and loss causation and retained a private investigator who interviewed former employees and other witnesses with potentially relevant information.  Despite Plaintiffs and Lead Counsel's belief that Plaintiffs' claims were meritorious, they realize that protracted litigation does not guarantee recovery. Plaintiffs faced risks and obstacles to achieving a greater recovery were the case to continue. Plaintiffs and Lead

Counsel considered these challenges prior to and during settlement negotiations.

29.    To prevail on their Exchange Act claims, Plaintiffs would have had to first plead and then prove: (1) a material misrepresentation or omission; (2) scienter, *i.e.,* a wrongful state of mind; (3) a connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) "loss causation," *i.e.*, a causal connection between the material misrepresentation and the loss. *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1008 (9th Cir. 2018) (citation omitted).

30.    First, Plaintiffs would have to overcome Defendants' anticipated motion(s) to dismiss. As an initial matter, Defendants alerted Plaintiffs and the Court that their anticipated motion to dismiss would seek dismissal on jurisdictional grounds including both venue and *forum non conveniens*, as they believed Australia was the more appropriate forum to hear this case (due to parallel litigation in Australia). Although Plaintiffs believe that the U.S. courts, specifically this Court, would be in the best position to apply U.S. law and have an interest in protecting U.S. investors, this was not a foregone conclusion.

31.    Defendants' anticipated motion(s) to dismiss would also have contested falsity and scienter.  As to falsity, Defendants maintained that their challenged statements were not false or misleading in any way at the time they were made.  As to scienter, Defendants would likely have argued that even if Plaintiffs could establish a material misstatement or omission, Plaintiffs lacked evidence upon which they could prove the requisite mental state of scienter—*i.e.*, that Defendants misled investors intentionally or with extreme recklessness. To succeed, the Amended Complaint must satisfy the strict pleading standards of the PSLRA which "requires a plaintiff to plead a complaint of securities fraud with an unprecedented degree of specificity and detail" and is "not an easy standard to comply with."  *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003).  While Plaintiffs believe they could have overcome Defendants' anticipated arguments at

the pleadings stage, there are no guarantees.

32.    Then, assuming Plaintiffs overcame Defendants' anticipated motion(s) to dismiss, the case would proceed to discovery. Plaintiffs in securities cases must prove their cases primarily through Defendants' documents and testimony and expert testimony. Defendants' testimony is often hostile and expert testimony difficult to present. These circumstances present atypical and material obstacles beyond many non-complex cases.

33.    Plaintiffs would have had to establish that Defendants made actionable, materially false or misleading statements or material omissions. Defendants would likely raise at summary judgment and trial that Plaintiffs cannot prove actionable misstatements or omissions.

34.    Even if they overcame Defendants' falsity and materiality arguments, Plaintiffs faced the risk of failing to prove intent to deceive, that Defendants acted with knowledge of or with recklessness for the alleged falsity of their statements and omissions. A defendant's state of mind in a securities case is often difficult to prove for lack of direct evidence or an admission. Defendants would attempt to show that they sincerely and reasonably believed the material truth of their public statements regarding Westpac's compliance with AML/CTF laws. The state of the law on such issues is also very complex and evolving. Accordingly, difficult factual and legal challenges confronted Plaintiffs in connection with proving scienter. How a jury would interpret and apply these facts to the law was uncertain.

35.    While Plaintiffs believe they could amass evidence to prove that Defendants made materially false and misleading statements and omissions, if the Court or a jury were to accept Defendants' arguments, the Settlement Class would recover nothing.

36.    Plaintiffs also faced challenges to establishing damages at trial. First, a jury would need to accept Plaintiffs' expert's testimony over Defendants' expert's testimony to arrive at a

DECLARATION OF SARA FUKS IN SUPPORT OF PLAINTIFFS' MOTIONS FOR: (1) FINAL APPROVAL OF PROPOSED CLASS ACTION SETTLEMENT AND PLAN OF ALLOCATION; AND (2) AN AWARD OF ATTORNEYS' FEES, REIMBURSEMENT EXPENSES, AND AWARD TO LEAD PLAINTIFF

damages figure. Even if a jury favored Plaintiffs' expert, Plaintiffs still faced the challenge to ensure that as many class members as possible submit their claim form to recover the total damages. This would be a significant undertaking and would entail the risk that class members would fail to timely submit a claim at trial to recover the full amount of damages.

37.    Accordingly, loss causation and the technical aspects of damages would require expert testimony and analysis, as well as fact evidence. Because establishing these elements would involve a "battle of experts," issues for the jury to sift through and weigh, the outcome of summary judgment and trial was and remains significant hurdles to recovery.

**B.    Risks of Proceeding to Motion to Dismiss, Summary Judgment, Trial, and Appeals**

38.    If Plaintiffs failed to reach the Settlement, and even if Plaintiffs defeated Defendants' anticipated motion to dismiss, Plaintiffs would have to survive Defendants' motion for summary judgment. Summary judgment would pose material risks for the Settlement Class. Plaintiffs would have to demonstrate to the Court that a genuine issue of material fact existed as to each element of their securities claims. Defendants would undoubtedly bolster their motion for summary judgment with any exculpatory evidence that arose during merits discovery. Here, risks existed at summary judgment that the Court could have determined as a matter of law that: the alleged misstatements were not false; that alleged misstatements were immaterial; and/or that loss causation could not be established.

39.    Plaintiffs would face evidentiary risks at trial. For example, documents Defendants would produce and the testimony of current and former Westpac employees, including Defendants, could significantly undermine the Complaint's allegations and the Court or jury could ultimately determine that Plaintiffs failed to satisfy every element of their claims. Additionally, given a securities

action's complexity requiring expert testimony, there were significant risks of jury confusion that could render them incapable of reaching a verdict for Plaintiffs.

40.     In connection with discovery, Plaintiffs would face obstacles of having to obtain evidence and take depositions in Australia. This discovery would be protracted, given the travel entailed, as well as costly.

41.     Even if Plaintiffs prevailed on liability on any of their claims and the jury awarded damages, Defendants would likely appeal the verdict and award. The appeals process would likely span several years, during which time the Settlement Class would receive nothing. In addition, an appeal would carry with it the risk of reversal, in which case the Settlement Class would receive no recovery despite having prevailed at trial.

42.     Without the Settlement, Plaintiffs faced multiple procedural hurdles and significant merit-based risks involved with protracted litigation. Plaintiffs and Lead Counsel considered each of these risks when agreeing to the Settlement.

## C.     The Risk of Failing to Maintain Class Certification Through Trial

43.     At the time of settlement, Plaintiffs had yet to move for class certification. To do so, Plaintiffs would have to retain an expert to opine on market efficiency – a costly undertaking. While Plaintiffs believe they would have prevailed in a contested class certification motion, given *Halliburton Co. v. Erica P. John Fund Inc.,* 134 S. Ct. 2398 (2014), Defendants would likely have argued and presented expert testimony seeking to demonstrate a lack of price impact on Westpac ADRs' prices on relevant days during the Class Period. This would result in a "battle of experts," which may have identified issues that would have to be deferred to the merits stage. Accordingly, even if Plaintiffs prevailed on class certification, Defendants would likely have continued to challenge market efficiency for Westpac ADRs, as well as the presumption of reliance through all subsequent

DECLARATION OF SARA FUKS IN SUPPORT OF PLAINTIFFS' MOTIONS FOR: (1) FINAL APPROVAL OF PROPOSED CLASS ACTION SETTLEMENT AND PLAN OF ALLOCATION; AND (2) AN AWARD OF ATTORNEYS' FEES, REIMBURSEMENT EXPENSES, AND AWARD TO LEAD PLAINTIFF

stages and before the jury.

44.    Even if Plaintiffs were successful at class certification, decertification before or after trial also remained a risk as a class certification order may be altered or amended before a final judgment. The Settlement avoids this risk.

## VI.    THE PLAN OF ALLOCATION

45.    As provided in the Long Notice, SCS will distribute the Net Settlement Fund according to the Plan of Allocation the Court preliminarily approved (Ex. D to the Bravata Decl. at 10-14). The Plan of Allocation was designed to distribute the Net Settlement Fund equitably and rationally. Lead Counsel developed the Plan of Allocation with a damages consultant. Plaintiffs and Lead Counsel believe that the Plan of Allocation provides a fair and reasonable method to distribute the Net Settlement Fund among Authorized Claimants.

46.    The Plan of Allocation provides for the Net Settlement Fund's distribution among Authorized Claimants on a *pro rata* basis based on "Recognized Loss" formulas tied to liability and damages. The formula considers the amount of alleged artificial inflation in the prices of Westpac ADRs. Plaintiffs' consulting damages expert analyzed the movement in the prices of Westpac ADRs and took into account the portion of the price drop allegedly attributable to the alleged fraud.

47.    Pursuant to the Plan of Allocation, SCS, under Lead Counsel's direction, will calculate each Authorized Claimant's *pro rata* share of the Net Settlement Fund based upon each Authorized Claimant's total Recognized Loss compared to the aggregate Recognized Losses of all Authorized Claimants. Calculation of Recognized Loss will depend upon several factors, including the dates Authorized Claimants purchased the securities, whether the securities were sold during the Class Period, and if so, when.[4]

---

[4] After SCS completes the claims administration process, giving rejected claimants the opportunity

DECLARATION OF SARA FUKS IN SUPPORT OF PLAINTIFFS' MOTIONS FOR: (1) FINAL APPROVAL
OF PROPOSED CLASS ACTION SETTLEMENT AND PLAN OF ALLOCATION; AND (2) AN AWARD OF
ATTORNEYS' FEES, REIMBURSEMENT EXPENSES, AND AWARD TO LEAD PLAINTIFF

48.    In sum, the proposed Plan of Allocation, developed with Plaintiffs' damages consultant, was designed to fairly and rationally allocate the Net Settlement Fund among Authorized Claimants. Accordingly, Plaintiffs and Lead Counsel respectfully submit that the proposed Plan of Allocation is fair, reasonable, and adequate and should be approved.

**VII.    PLAINTIFFS' COUNSEL'S APPLICATION FOR ATTORNEYS' FEES, REIMBURSEMENT OF EXPENSES, AND AWARD TO PLAINTIFFS IS REASONABLE**

**A.    Consideration of Relevant Factors Justifies an Award of a One-Third Fee**

49.    For its efforts on behalf of the Settlement Class, Lead Counsel is applying for compensation from the Settlement Fund on a percentage basis. As explained in the Memorandum of Points and Authorities in Support of Plaintiffs' Motion for an Award of Attorneys' Fees, Reimbursement of Expenses, and Award to Plaintiff ("Fee Brief"), courts within the Ninth Circuit recognize that the percentage-of-recovery method is the prevailing and appropriate method of determining attorneys' fees.

50.    The Notice stated that Lead Counsel would seek up to one-third of the Settlement Fund. Bravata Decl., Exs. A, C-D at 1. Lead Counsel seeks a fee award of one-third of the Settlement Fund. For the reasons I discuss below and in the accompanying Fee Brief, such award is fair and appropriate.

**i.    The Favorable Settlement Achieved**

51.    The Settlement Plaintiffs achieved on behalf of themselves and the Settlement Class

---

to contest the rejection of their claims, Plaintiffs will file a motion seeking the Court's approval of the Claims Administrator's findings and authority to distribute the Net Settlement Fund. Pursuant to the Stipulation, the Claims Administrator will continue to distribute the Net Settlement Fund to Authorized Claimants until it is no longer economically feasible to do so. At that point, Plaintiffs will seek the Court's approval to donate the remainder to an appropriate not-for profit charitable organization.

DECLARATION OF SARA FUKS IN SUPPORT OF PLAINTIFFS' MOTIONS FOR: (1) FINAL APPROVAL OF PROPOSED CLASS ACTION SETTLEMENT AND PLAN OF ALLOCATION; AND (2) AN AWARD OF ATTORNEYS' FEES, REIMBURSEMENT EXPENSES, AND AWARD TO LEAD PLAINTIFF

is a factor courts consider in granting fee awards. Plaintiffs' damages expert estimated that maximum damages were between $15 million and $21.6 million. The Settlement will compensate Settlement Class Members between 14.3% and 21.6% of Plaintiffs' estimated aggregate damages.

52.     Considered in view of the substantial risks and obstacles to recovery if the Action were to continue through summary judgment, to trial, and through likely post-trial motions and appeals, the $3.1 million Settlement is fair, reasonable, and an excellent result for the Settlement Class.

53.     This recovery was the result of thorough investigative efforts and settlement negotiations. As a result of this Settlement, Settlement Class Members will benefit and receive compensation for their losses and avoid the very substantial risk of no recovery in the absence of a settlement.

### ii.  The Risks and Complexities of Contingent Class Action Litigation

54.     From the outset, Lead Counsel understood that it was embarking on a complex, expensive, and lengthy litigation with no guarantee of compensation for their investment of time and money the case would require. In undertaking that responsibility, Lead Counsel dedicated sufficient resources to the Action's prosecution, covering out-of-pocket the costs that this required. With an average lag time of several years for these cases to conclude, the financial burden on contingent-fee counsel is far greater than on a firm that is paid on an ongoing basis. Indeed, Plaintiffs' Counsel received no compensation during the course of the Action but have spent 537.7 hours of time for a total lodestar of $421,999.50 and have incurred $24,776.41 in out-of-pocket expenses in prosecuting the Action for the benefit of the Settlement Class.

55.     Lead Counsel also bore the risk that it would fail to recover on behalf of Plaintiffs and the class. Even with competent efforts, success in contingent-fee litigation, such as this, is never assured, and counsel risked receiving nothing and failing to recover the monies it expended out-of-

pocket.

56.     Lead Counsel knows from their experience that the commencement of a class action does not guarantee a settlement. To the contrary, it takes hard work and diligence by skilled counsel to develop the facts and theories that are needed to sustain a complaint or win at trial, or to convince sophisticated defendants to engage in serious settlement negotiations at meaningful levels. Lead Counsel is cognizant of hard-fought lawsuits where, because of the discovery of facts unknown when the case was commenced, changes in the law during the pendency of the case, a judge's or jury's decision following a trial on the merits resulted in no class recovery or fees for attorneys.

57.     Proceeding to discovery, summary judgment, trial, or appeal requires counsel to outlay and to bear material costs and to dedicate considerable uncompensated time. The fees that courts award in successful cases cover material overhead expenses incurred during litigation.

58.     Courts have repeatedly found that appointing experienced firms such as the Rosen Law Firm to serve as class counsel is in the public interest, enabling private enforcement of the federal securities laws and regulations. Private enforcement of the federal securities laws occurs only if investors obtain a semblance of parity in representation with that available to corporate defendants. To realize this public policy, courts should award fees that will adequately compensate private plaintiffs' counsel, taking into account the enormous risks undertaken with a clear view of the economics of a securities class action. *See* Fee Brief, §I.D.4. fn 6.

59.     As discussed in greater detail above, this case was fraught with significant risk factors concerning liability and damages. Plaintiffs' success was by no means assured. Were this Settlement not achieved, and even if Plaintiffs prevailed at the pleadings and then at trial, Plaintiffs and Lead Counsel faced potentially years of costly and risky appellate litigation against Defendants, with ultimate success far from certain and the prospect of no recovery significant. It is also possible that a

DECLARATION OF SARA FUKS IN SUPPORT OF PLAINTIFFS' MOTIONS FOR: (1) FINAL APPROVAL OF PROPOSED CLASS ACTION SETTLEMENT AND PLAN OF ALLOCATION; AND (2) AN AWARD OF ATTORNEYS' FEES, REIMBURSEMENT EXPENSES, AND AWARD TO LEAD PLAINTIFF

jury could have found no liability or no damages. Lead Counsel therefore respectfully submits that based upon the considerable risk factors present, this case involved a very substantial contingency risk to counsel.

### iii.   Lead Counsel's Efforts and the Lodestar Cross-Check

60.    Throughout the pendency of the Action, Lead Counsel focused on advancing the litigation to achieve the best outcome for the Settlement Class, whether through settlement or trial, by the most efficient means necessary.

61.    I attach hereto as **Exhibits 2 and 3** declarations from Plaintiffs' Counsel, submitting them in support of the request for an award of attorneys' fees and payment of litigation expenses. *See* Declaration of Sara Fuks of The Rosen Law Firm, P.A. Concerning Attorneys' Fees and Expenses ("Rosen Fee Decl." (Exhibit 2)) and the Declaration of Jeffrey S. Ratliff of Ransom, Gilbertson, Martin & Ratliff, LLP Concerning Attorneys' Fees and Expenses ("Ratliff Fee Decl."(Exhibit 3)).

62.    Included in the Rosen Fee Decl. and Ratliff Fee Decl. are schedules detailing the amount of attorney and professional support staff time spent on the litigation and the lodestar calculations, *i.e.,* their hours multiplied by their billing rates. As explained in each declaration, they were prepared from contemporaneous daily time records regularly prepared and maintained by the respective firms.

63.    The hourly billing rates of Plaintiffs' Counsel here range from $425 to $1,100 for attorneys. The hourly rates for attorneys and professional support staff included in these schedules are reasonable and in line with firms in the New York City and Portland, Oregon markets.

64.    Plaintiffs' Counsel have collectively expended 537.7 hours in the prosecution and investigation of the Action comprised of 519.10 hours for Lead Counsel and 18.6 hours for Local Counsel. *See* Rosen Fee Decl. at ¶6 and Ransom Fee Decl. at ¶6. The resulting collective lodestar of

$421,499.50 is comprised of $415,979.50 for Lead Counsel and $5,520.00 for Local Counsel. *Id*. Pursuant to a lodestar "cross-check," the requested fee of one-third ($33^{1/3}$%) of the Settlement Fund ($1,033,333.33) results in a lodestar multiplier of 2.45 which does not include any time that will necessarily be spent from this date forward administering the Settlement, preparing for and attending the Settlement Hearing, assisting Settlement Class Members, and moving for a distribution order.  It also does not include any time spent preparing the Fee Brief or fee application.

### iv.   The Skill Required and Quality of the Work

65.    Lead Counsel is an experienced and skilled securities litigation law firm. The Rosen Law Firm's resume, attached as Exhibit A to the Rosen Fee Decl., describes the experience of the Rosen Law Firm's attorneys involved in this litigation. As the firm resume demonstrates, the Rosen Law Firm has been appointed in numerous securities class actions throughout the country and has achieved impressive recoveries for investors. The Rosen Law Firm's recent notable achievements include securing a $250 million settlement for Alibaba Group Holding Ltd. investors, the largest U.S. securities class action settlement against a Chinese issuer. Additionally, The Rosen Law Firm achieved settlements of $110 million settlement for Fiat Chrysler Automobiles N.V. investors, $29 million for Och-Ziff Capital Management Group LLC investors, and $41.5 million for Silver Wheaton Corp. investors. Thus, the Settlement Class has benefited from Lead Counsel's experience and considerable time and effort dedicated to this case which helped achieve the Settlement.

66.    Courts around the country have recognized The Rosen Law Firm's experience and competence. *See Yedlowski v. Roka Bioscience, Inc.*, No. 14-CV-8020-FLW-TJB, 2016 WL 6661336 at *21 (D.N.J. Nov. 10, 2016) ("The Rosen Law Firm is highly experienced in the complex field of securities fraud class action litigation"); *Knox v. Yingli Green Energy Holding Co. Ltd.*, 136 F. Supp. 3d 1159, 1165 (C.D. Cal. 2015) ("The Rosen Law Firm is 'highly qualified [and] experienced' in

securities class actions"); *In re Nature's Sunshine Prod., Inc.*, No. 2:06-CV-267 TS, 2006 WL 2380965, at *2 (D. Utah Aug. 16, 2006) (The Rosen Law Firm is "qualified, experienced and able to vigorously conduct the proposed litigation.").

67.    Additionally, the quality of work performed by Lead Counsel in attaining the Settlement should be evaluated in light of the quality of the opposition. Here, Defendants were represented by Cravath, Swaine & Moore LLP and Jones Day, two highly respected firms that vigorously represented their clients' interests throughout the Action. In the face of this experienced and formidable opposition, Lead Counsel was nonetheless able to persuade Defendants to settle the case on favorable terms to the Settlement Class.

## B.  Request for Litigation Expenses

68.    Plaintiffs' Counsel seeks payment from the Settlement Fund of $24,776.41 in litigation expenses Plaintiffs' Counsel reasonably and necessarily incurred in connection with commencing and prosecuting the claims against Defendants. Of this amount, the Rosen Law Firm incurred $23,776.41 in out-of-pocket expenses and Ransom Firm incurred $1,000 in out-of-pocket expenses. These amounts are reflected in the books and records of each firm. *See* Rosen Fee Decl. and Ransom Fee Decl.

69.    From the beginning of the case, Plaintiffs' Counsel was aware that they might not recover any expenses. Thus, Plaintiffs' Counsel was motivated to, and did, take steps to minimize expenses whenever practicable without jeopardizing the vigorous and efficient prosecution of the case.

70.    Plaintiffs' Counsel seek reimbursement of expenses that are necessarily incurred in litigation and routinely charged to clients billed by the hour. These expenses include, among others, financial expert fees, investigator fees, travel costs, legal and factual research, press release and notice

to class member fees, postage fees, and court filing and *pro hac vice* fees.

71.     All of the litigation expenses incurred, which total $24,776.41, were necessary to prosecute this litigation.

### C.     Award to Lead Plaintiff

72.     Edward Davies seeks an award for the time, effort, and oversight he dedicated to this litigation. The Private Securities Litigation Reform Act of 1995 ("PSLRA") empowers courts to approve such requests. Davies seeks a modest award of $1,500. I attach hereto as **Exhibit 4** the Declaration of Edward Davies ("Davies Decl."), outlining the participation of Mr. Davies in securing this result for the Settlement Class.

## VIII.     SETTLEMENT CLASS' REACTION TO THE FEE AND EXPENSE REQUESTS AND AWARD TO PLAINTIFFS

73.     Of the over 84,341 Postcard Notices SCS mailed to potential Settlement Class Members advising them of the fees, expense reimbursement, and awards Plaintiffs intended to seek, as of the date of this Declaration, no member of the Settlement Class has objected. If a member of the Settlement Class objects prior to the March 30, 2021 deadline for objections, Lead Counsel will respond to any objections received in its reply papers in further support of the fee request.

## IX.     CONCLUSION

74.     In view of the recovery to the Settlement Class and the substantial risks of this litigation, I believe that the Settlement is fair, reasonable, and adequate and respectfully request the Court finally certify the Settlement Class, approve the Notice to the Settlement Class, approve the Settlement as fair, reasonable, and adequate, and approve the Plan of Allocation.

75.     Further, I believe that attorneys' fees of one-third the Settlement Fund, reimbursement of $24,776.41 in out-of-pocket expenses, and an award to Lead Plaintiff of $1,500 is fair and reasonable under Fed. R. Civ. P. 23 and the PSLRA.  As such, I respectfully request that the Court

approve them.

I declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct.

Executed on March 16, 2021 at New York, NY.

/s/ *Sara Fuks*
Sara Fuks

DECLARATION OF SARA FUKS IN SUPPORT OF PLAINTIFFS' MOTIONS FOR: (1) FINAL APPROVAL OF PROPOSED CLASS ACTION SETTLEMENT AND PLAN OF ALLOCATION; AND (2) AN AWARD OF ATTORNEYS' FEES, REIMBURSEMENT EXPENSES, AND AWARD TO LEAD PLAINTIFF